UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 06-CV-1235 (JFB)
_____

SCOTT D. BRIGGS,

Plaintiff,

VERSUS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

Defendant.

_____

MEMORANDUM AND ORDER
August 14, 2007
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Scott Briggs ("Briggs" or "plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act, (as amended 42 U.S.C. § 405(g)), challenging the final decision of defendant Commissioner of the Social Security Administration (the "Commissioner") denying the plaintiff's application for Disability Insurance Benefits ("SSDI benefits") under the Social Security Act (the "Act"). The Commissioner moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes defendant's motion and cross-moves for judgment on the pleadings. For the reasons that follow, the case is remanded to the Administrative Law Judge for further proceedings in accordance with this Memorandum and Order.

I. BACKGROUND AND PROCEDURAL HISTORY

A. Prior Proceedings

Plaintiff applied for SSDI benefits on July 24, 2003, alleging disability due to Asperger's Syndrome ("A.S.") and clinical depression. Plaintiff contended that these conditions have rendered him unable to perform work since August 24, 2002. (Record at 48-49.)[1] Plaintiff's SSDI benefits application was denied on October 8, 2003, and on October 17, 2003, he filed a Request For Hearing. (*Id.*

---

[1] References to "Record" are to the certified administrative record of proceedings in this case.

at 24, 28.) On May 25, 2005, plaintiff, represented by counsel, appeared at a hearing before Administrative Law Judge Andrew S. Weiss (the "ALJ"). (*Id*. at 169-188.) The ALJ issued a decision finding that plaintiff was not disabled because he was able to perform simple, one- and two-step tasks, and could therefore return to his prior employment as an office worker or security desk worker. (*Id*. at 16-17.) By order dated March 9, 2005, the Appeals Council denied plaintiff's request for review, making it the final administrative determination in the case. (*Id*. at 5.) This appeal followed.

After describing plaintiff's background, the Court will review plaintiff's medical history, followed by the ALJ's findings.

B. Plaintiff's Background

Plaintiff was born on July 20, 1968. (*Id*. at 170.) He alleges that his disability commenced on August 24, 2002, when plaintiff was thirty-four years of age. He began his undergraduate education at Hofstra University, but left after one year due to "academic difficulties." (*Id*. at 171.) Plaintiff then enrolled in the New York Institute of Technology, where he graduated, after five years, with a bachelor's degree in communications. (*Id*. at 171.) He has since worked as a security guard and held various temporary office jobs. (*Id*. at 58, 73-75, 81.)

Plaintiff believes that "social and interpersonal problems" preclude him from maintaining steady employment. (*Id*. at 48.) He testified that he will generally hold a job for a year or two at most, and then either gets fired or quits. (*Id*. at 176-77.) He testified that he has been fired from at least eight to nine jobs since college. (*Id*. at 184.) He claims that the longest job he has held was as an office worker, in which he was responsible for data entry, proofreading, record maintenance and report preparation. (*Id*. at 49.) Plaintiff states that he has also been employed in the advertising, publishing and marketing industries. (*Id*. at 104.)

Plaintiff's most recent employment was in a front desk security position at an internet company in downtown Manhattan. (*Id*. at 172.) He testified that he was able to take the subway to work by himself, but that he had "some major difficulties" at the office, many of which stemmed from disagreements with co-workers. (*Id*. at 68, 173.) Plaintiff was ultimately fired from the position after sending a threatening email to a co-worker who he claims harassed him. (*Id*. at 174-75.)

Plaintiff testified that he has had counseling "on and off" for the past fifteen to sixteen years. (*Id*. at 180.) He further testified that he is currently taking 150 mg/day of Wellbutrin for depression and anxiety. (*Id*. at 79, 176.) Plaintiff currently lives alone; his mother pays the rent because he is "tapped out" financially. (*Id*. at 63, 178.) He uses food stamps, but is able to shop for groceries, prepare his own meals, clean, do laundry, and iron. (*Id*. at 65- 66.) He testified that he has some friends, but does not see them as often as in the past. (*Id*. at 179.) In his Function Report form, however, plaintiff wrote that he spends time with friends and family "often, monthly." (*Id*. at 68.) In his free time, plaintiff listens to music, plays guitar, surfs the internet, runs errands, and does some freelance writing. (*Id*. at 64, 176.)

C. Medical Evidence

1. Treatment Prior to Alleged Onset Date

On November 1, 2001, Dr. Regina LeVerrier ("Dr. LeVerrier") at Premier Healthcare conducted a psychiatric evaluation of plaintiff. (*Id*. at 101.) Dr. LeVerrier noted that plaintiff had a history of depression which was previously treated on an out-patient basis with Prozac. (*Id*. at 103.) The doctor observed that plaintiff was cooperative and had an appropriate affect. (*Id*. at 106.) She described plaintiff's speech and language as vague, slightly pressurized, and over-detailed. (*Id*. at 106.) According to Dr. LeVerrier, plaintiff expressed feelings of helplessness and stated that his main concern was his inability to hold a job. (*Id*. at 102.) Dr. LeVerrier observed that plaintiff was fully oriented, assessed his judgment as fair, and detected no psychosis. (*Id*. at 106.) Plaintiff admitted, however, that he loses his temper easily when frustrated. (*Id*. at 97.)

Dr. LeVerrier diagnosed depression, single episode, resolved; an adjustment disorder with depression and anxious mood; and noted that he needed to rule out A.S. (*Id*. at 108.) She suggested a vocational assessment and stated that plaintiff should continue to perform temporary work for money. (*Id*. at 108.) At a consultation on December 13, 2001, Dr. LeVerrier informed plaintiff and his mother of the A.S. diagnosis and referred him for psychological treatment. (*Id*. at 97.)

On February 19, 2002, plaintiff underwent a comprehensive psychological evaluation by Glenn Ellenbogen, Ph.D. ("Dr. Ellenbogen"), at the YAI-National Institute for People With Disabilities ("YAI"). (*Id.* at 90.) Dr. Ellenbogen reported that, while plaintiff was cooperative, he appeared remarkably anxious and laughed nervously when giving responses. (*Id*. at 91.) He also tended to be prolific in his answers, sometimes overly wordy to the point that he contaminated his initial, appropriate responses. (*Id*.) IQ testing of plaintiff revealed that plaintiff has a Verbal IQ of 104, a Performance IQ of 89, and a Full Scale IQ of 98, placing him in the average range of intelligence. (*Id*. at 92, 95.) Plaintiff's adaptive behavior skills were categorized as "low," with an Adaptive Behavior Composite Standard Score of 56, at the nine-years, eleven-months equivalent, well below the first percentile. (*Id*. at 93, 95.) Plaintiff's poorest score was in the socialization domain, with a Standard Score of 36, at the four-years eleven-months age equivalent, also well below the first percentile. (*Id*. at 94.) Dr. Ellenbogen recommended therapy, a social skills development group, and a referral for case management services. (*Id*. at 96.)

In March 2002, Sophia Townsend ("Ms. Townsend"), a certified social worker at YAI, conducted a psychosocial evaluation of plaintiff. (*Id*. at 87.) She found his expressive and receptive language skills to be very good, and noted that he was very engaging. (*Id*.) Ms. Townsend recommended individual psychotherapy for plaintiff. (*Id.* at 89.) Plaintiff, however, declined her suggestion to attend a socialization group for the time being. (*Id*.)

Plaintiff began treatment with Valerie Gaus, Ph.D. ("Dr. Gaus"), a licensed psychologist at YAI, on April 12, 2002. (*Id*. at 85.) Dr. Gaus opined that A.S. had affected plaintiff since early childhood, and has resulted in severe deficits in social and adaptive behavior. (*Id*.) Dr. Gaus noted that A.S. differs from other forms of autism only in that patients with A.S. tend to have greater

3

strengths in language and verbal skills, which can mask the need for assistance in most basic daily living skills. (*Id.*) Dr. Gaus opined that plaintiff's slow processing of information leads him to be rigid and unable to deal with changes to his environment. (*Id.*) A skill that he may know how to perform in one situation, he is incapable of performing in another. (*Id.*) She further noted that his disability contributes to poor judgment and great difficulty solving problems that occur in his daily life. (*Id.*)

2. Treatment After Alleged Onset Date

Plaintiff was referred to Thakker Mangal, M.D. ("Dr. Mangal"),[2] as a result of his poor anger control, inability to sustain a job, and possible depression. (*Id.*) Plaintiff reported to Dr. Mangal instances of frustrated outbursts and inappropriate behavior when becoming angry. (*Id.* at 143, 144, 146.) He also described difficulties waking up in the morning which caused him to be unable to get to work on time. (*Id.* at 144.)

On December 4, 2003, Dr. Mangal performed a psychiatric evaluation of plaintiff. (*Id.* at 143.) During the evaluation, plaintiff was mildly anxious and became over-expansive at times. (*Id.*) However, he exhibited no hyperactivity. (*Id.* at 148.) Dr. Mangal described plaintiff as cooperative and responsive, and as exhibiting good memory, attention, orientation, and abstraction. (*Id.*) He assessed plaintiff's judgment as fair, but deemed his insight and impulse control as poor. (*Id.* at 149.) Dr. Mangal noted that plaintiff has difficulty controlling his anger when he is frustrated or has received negative results – for instance, when he is rejected for a job. (*Id.* at 144.) Dr. Mangal diagnosed plaintiff with A.S. (*Id.* at 150.) He prescribed Zoloft, called for monthly follow-ups, and recommended that plaintiff participate in counseling and recreational activities. (*Id.*)

On September 25, 2004, plaintiff came under the care of Kusum Kathpalia, M.D. ("Dr. Kathpalia"), a psychiatrist at YAI Premier Healthcare. (*Id.* at 160.) Dr. Kathpalia noted that plaintiff demonstrated high anxiety, social impairment, an inability to form steady relationships and hold a job, a low frustration tolerance, poor insight and judgment, and an inability to cope with social and vocational needs. (*Id.* at 136, 160.) Dr. Kathpalia assessed that plaintiff has A.S., and as a result, exhibits social anxiety and has difficulties relating to and negotiating with others. (*Id.* at 160-61.) Dr. Kathpalia went on to report that plaintiff becomes irritable when he is dissatisfied, and that he feels easily rejected. (*Id.* at 136.) She noted that plaintiff has poor to no ability to deal with work stresses or to carry out complex instructions, but has a fair ability to follow work rules, relate to co-workers and the public, interact with supervisors, and function independently. (*Id.*) She assessed that plaintiff's ability to remember, understand and carry out simple job instructions is good. (*Id.* at 137.)

By letter dated August 11, 2003, Risa-Ilene Langus, Service Coordinator at the New York Families for Autistic Children ("NYFAC") reported that plaintiff "[had] been a consumer at [NYFAC]" since March 17,

---

[2] There is a discrepancy as to the doctor's actual surname. His personal stamp reads, "Thakker Mangal MD," whereas his signature appears to read (although it is unclear), "Mangal Thakker." In his opinion, the ALJ refers to the doctor as both "Thakker Mangal, M.D." and "Dr. Thakker." Likewise, the plaintiff's memorandum refers to both "Dr. Mangal" and "Dr. Thakker." (Record at 15, 16, 150; Pl.'s Mem 7, 9.)

4

2003. (*Id*. at 110.) In a letter dated January 4, 2004, a psychiatrist at YAI advised that plaintiff was under psychiatric care for A.S. (*Id*. at 142.) The letter stated that plaintiff is "disabled" and has difficulty performing routine tasks. (*Id*.)

Plaintiff was evaluated by David Roll, Ph.D. ("Dr. Roll") on July 12, 2005. (*Id*. at 164.) Dr. Roll noted that plaintiff exhibited good attention and concentration, but that his motor activity was slightly disconnected from conversational context and that when orienting to the speaker, his movements did not flow smoothly. (*Id*. at 163.) Dr. Roll further noted that plaintiff exhibits obsessive thinking, which leads to unfortunate behavioral outcomes. (*Id*. at 165.) He observed that plaintiff ruminates over perceived slights, and in doing so, heightens his emotional response by reviewing past incidents. (*Id*. at 165.) Plaintiff reported to Dr. Roll that this behavior has led him to say things to his bosses and co-workers that ultimately resulted in his losing jobs. (*Id*.) Plaintiff stated that he was continuing under the care of Dr. Kathpalia, and that he was responding well to the medication Wellbutrin. (*Id*.) Plaintiff reported that he was significantly less depressed and that his motivation to work and seek services had increased dramatically. (*Id*.)

Dr. Roll reported that plaintiff had been recently arrested for dissemination of indecent material to a minor. (*Id*. at 164.) During a July 22, 2005 therapy session, plaintiff expressed great remorse and stated that his growing involvement with Internet pornography was the result of isolation, lack of intimate relationships and unsuccessful attempts to find jobs. (*Id*. at 164-165.) Dr. Roll opined that plaintiff was in clear need of extensive psychiatric services and supports. (*Id*. at 166.) He believes that plaintiff's social isolation and inability to find work have exacerbated his psychological problems and has created a situation ripe for the poor judgment he showed in his use of the Internet. (*Id*. at 166.) Dr. Roll recommended that plaintiff continue individual psychotherapy and psychiatric consultation, and in addition, attend a structured day program with a strong vocational component, social opportunities and social skills training, recreational programming and intensive case management. (*Id*. at 166.) A referral by Dr. Roll to the North Shore University Hospital Vocational Rehabilitation Center, dated August 30, 2005, stated that Briggs was being referred "due to poor social skills [and] social judgment related to [A.S.]" and that Briggs "has been unemployed for two years and without friends leading to isolation except for interactions with his mother. This isolation has exacerbated depression, anxiety [and] anger [and] has led to difficulties with the law." (*Id*. at 159.) By letter dated September 7, 2005, Jessica Randolph, a rehabilitation counselor with the North Shore LIJ University Hospital advised that plaintiff was admitted September 6, 2005, and would be attending the program Monday through Friday from 9:15 a.m. to 3:15 p.m. (*Id*. at 158.)

3. Consultative Evaluations After Alleged Onset Date

On September 11, 2003, Michael Bernstein, M.D. ("Dr. Bernstein"), a psychiatrist with New Horizons Counseling, examined plaintiff. (*Id*. at 111.) Dr. Bernstein reported that plaintiff's "general fund of knowledge" was very good, but that he spoke with an anxious tone of voice and experienced difficulty changing topics. (*Id*. at 112.) He was unable to subtract by serial sevens and was apologetic. (*Id*.) Dr.

5

Bernstein assessed that plaintiff's condition appeared to meet the criteria for A.S., which he rated as mild. (*Id*.) He indicated that plaintiff "would benefit from psychotherapy and medicine and perhaps SSI which would address his depressive symptoms as well as anxiety and social withdrawal." (*Id*.)

On March 11, 2005, Rama A. Anne, M.D. ("Dr. Anne") completed a form entitled, "Confidential Medical Report – Psychiatric Disability." (*Id*. at 129.) Dr. Anne indicated that plaintiff was overly talkative, had poor impulse control, and had limited insight and judgment. She also reported that plaintiff exhibited poor social skills, anger control, frustration tolerance, and adaptive skills. (*Id*. at 140.) Dr. Anne assessed that plaintiff possessed a "fair" ability to work.[3] (*Id*. at 139-140.)

### 4. State Agency's Review of the Medical Record

S. Bonete, M.D. ("Dr. Bonete"), a State Agency Review Physician, completed a "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment" of plaintiff on October 7, 2003. (*Id*. at 113, 127.) Dr. Bonete opined that plaintiff had no functional limitations in performing the activities of daily living, but had moderate limitations in his abilities to perform activities within a schedule, retain regular attendance and be punctual with customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal work day or work week, interact appropriately with the general public, accept instructions and respond appropriately to criticism. (*Id*. at 123, 127-128.) Dr. Bonete concluded that plaintiff had the mental capability to perform work-related activity in a low stress setting. (*Id*. at 129.)

### E. The ALJ's Decision

On August 24, 2005, the ALJ issued his decision finding that plaintiff "is not entitled to a period of disability or Disability Insurance Benefits under Sections 216(i) and 223, respectively, of the Social Security Act." (*Id*. at 18.) After laying out the applicable law and making factual findings, the ALJ found, *inter alia*, the following:

> (1) The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of th[e] decision.
>
> (2) The claimant has not engaged in substantial gainful activity since the alleged onset of the disability.
>
> (3) The claimant's Asperger's syndrome is considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).
>
> (4) These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> (5) [T]he claimant's allegations regarding his limitations are not

---

[3] Dr. Anne's assessment of plaintiff's Global Assessment of Functioning ("GAF") could be read as either 45 or 65; her handwriting is unclear. (Record at 139.)

6

totally credible for the reasons set forth in the body of the decision.

(6) The claimant has no exertional limitations. However, because of his mental impairment, he is limited to simple one-and-two step tasks.

(7) The claimant's past relevant work as an office worker and security desk worker did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565).

(8) The claimant's medically determinable Asperger's syndrome does do [sic] not prevent the claimant from performing his past relevant work.

(9) The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

(*Id*. at 17-18.) In reaching these conclusions, the ALJ declined to afford controlling weight to plaintiff's treating physicians and, as stated in the findings, found plaintiff not entirely credible. (*Id*. at 16, 17.)

II. DISCUSSION

A. Applicable Law

1. Standard of Review

A district court may only set aside a determination by an ALJ which is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotations and citations omitted). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm. of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

2. The Disability Determination

A claimant is entitled to disability benefits under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not

7

only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits h[is] capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have the listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform [his] past relevant work. Finally, if the claimant is unable to perform [his] past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown*, 174 F.3d at 62 (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and (4) claimant's educational background, age, and work experience." *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. Application

In opposing defendant's motion and cross-moving, plaintiff argues that the ALJ's decision is not supported by substantial evidence and is the result of legal error. (Pl.'s Mem. at 10.) Specifically, plaintiff argues that the ALJ failed to apply the Commissioner's regulations and rulings with regard to evaluating the medical opinion evidence, developing the record, and assessing the plaintiff's credibility. (*Id.*) With regard to his allegation of the ALJ's failure to apply the Commissioner's regulations in reviewing the medical opinion evidence, plaintiff contends that the ALJ mischaracterized the treating physician's opinion evidence, that the ALJ's determination as to residual functioning capacity ("RFC") was not sufficiently specific, and that the treating physician's opinion should have been given significant, if not controlling, weight.

The ALJ found, as to the first step of the five-step procedure for evaluating disability claims, that there was no indication that plaintiff "has engaged in any substantial

8

gainful activity at any time since his application was filed." (Record at 13.) Plaintiff testified that he worked part time in 2004; however, the ALJ found that this work activity did not constitute a successful attempt as it ended due to apparent medical reason. (*Id*. at 13). At the second and third steps, the ALJ determined that the medical evidence indicates that plaintiff has A.S., "an impairment that is 'severe' within the meaning of the Regulations, but not 'severe' enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (*Id*. at 14.) At the fourth step, the ALJ found that the plaintiff has no exertional limitations; however, due to his mental impairment, he is limited to "simple, one-and-two step tasks." (*Id*. at 16.)

After concluding that plaintiff's A.S. was severe and that plaintiff was limited to simple, one- and two- step tasks, the ALJ found that plaintiff's past relevant work as an office worker and security desk worker "did not require the performance of work-related activities precluded by his residual functional capacity." (*Id*. at 17.) As such, the ALJ determined that plaintiff retains the "residual functional capacity to return to past work," and is therefore not disabled within the meaning of the Act and cannot receive SSDI benefits. (*Id*. at 17.) However, in spite of finding that plaintiff's condition was severe and that plaintiff was limited to "simple one-and-two step tasks," the ALJ did not identify any specific mental limitations in his residual functional capacity assessment and did not review and compare the mental demands of plaintiff's past work. 20 C.F.R. § 404.1520(e). The ALJ's only reference to plaintiff's former employment is the ALJ's conclusory, broad-based statement that, "[i]n his former security desk job and office work, as generally performed in the national economy, the claimant's past work did not require the performance of work activities precluded by his medically determinable impairment, thus he is able to return to the type of work he performed in the past." (Record at 17.)

The term "residual functional capacity" ("RFC") is defined in the Regulations as "the most [an individual] can still do despite [his] limitations." 20 CFR § 404.1545. Here, claimant's disability stems from a mental impairment. Mental abilities are first assessed by an evaluation of the nature and extent of the claimant's mental limitations and restrictions, and then the individual's RFC for work activity on a regular and continuing basis is determined. 20 CFR § 404.1545(c). "A limited ability to carry out certain mental activities such as understanding, remembering, and carrying out instructions, and responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce the ability to do past work and other work." *Id*. "Claims that involve mental or emotional impairments require 'a precise description of the plaintiff's past particular job duties which are likely to produce tension and anxiety, *e.g.* speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.'" *Smith*, 69 F. Supp. 2d at 378 (quoting SSR 82-62, Soc. Sec. Rep. Serv., rulings 1975-82, 1982 WL 31386 at *4; citing *Welch v. Chater*, 923 F. Supp. 17, 20 (W.D.N.Y. 1996)). Accordingly, particularly in light of the ALJ's failure to describe what weight, if any, was given plaintiff's treating physicians, as discussed *infra*, this Court must remand the case for further proceedings so that the ALJ may make particularized findings with respect to

plaintiff's residual functional capacity and the demands of plaintiff's past work.

In addition to the ALJ's failure to provide the appropriate specificity in determining plaintiff's residual functional capacity to perform his past relevant work, the ALJ failed to apply the treating physician rule in evaluating how plaintiff's impairment limits his ability to perform work activities. The "treating physician rule," as it is known, "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 119; *Schisler v. Sullivan*, 3 F.3d 563, 567 (3d Cir. 1993). The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions by your treating sources . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). This proclivity toward the treating physician's opinion is based on the fact that treating physicians are "most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." 20 C.F.R. § 404.1527(d)(2); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

According to the ALJ, plaintiff's treating sources consist of Dr. LeVerrier, Dr. Gaus, Dr. Mangal, and Dr. Kathpalia. Specifically, the ALJ stated, "[i]n reaching a conclusion about the claimant's residual functioning capacity, the undersigned considered the opinion of the claimant's treating sources." (Record at 16.) The ALJ then restated portions of medical opinions from the aforementioned physicians. (*Id*. at 16.) The ALJ noted Dr. LeVerrier's opinion that the claimant has been disabled since the age of two or three years, Dr. Gaus' opinion that the claimant's manner in which he processes information may make him very rigid and unable to accept changes to his environment, and Dr. Mangal's opinion that claimant had various difficulties, such as keeping appointments and communicating. (*Id*.) The

ALJ discredited the evidence of each of the three treating sources by pointing to evidence that, despite his illness, claimant has graduated from college, worked at several jobs, has lived by himself and used public transportation. (*Id*.) The ALJ also pointed to Dr. Thakker's examination notes in December 2003 which indicate that the claimant was alert, spontaneous, cooperative, and made good eye contact. (*Id*.)

After considering plaintiff's various limitations as described by three of his treating physicians, the ALJ declared that, "in spite of the opinions of Drs. LeVerrier, Gaus, and [Mangal], Dr. Bernstein opined that the claimant's condition was only mild." (*Id*. at 16.) The ALJ correctly stated that he "is not bound to accept a treating physician's conclusion as to disability, particularly where it is not supported by detailed, clinical, and diagnostic evidence" and "the final responsibility for deciding claimant's residual functional capacity and the legal determination of 'disability' is reserved exclusively to the Administration." (*Id*.) However, in declining to afford plaintiff's treating physicians controlling weight, the ALJ failed to evaluate the required factors listed in the regulations. *See* 20 C.F.R. § 404.1572(d). Here, most importantly, the ALJ did not consider the consistency of the physicians' opinions with one another and did not sufficiently consider the evidence supporting the opinions.

Furthermore, based on the ALJ's statement that he is not bound to accept the conclusions of a treating physician, it seems that the ALJ is rejecting all four of the treating physicians' opinions as to claimant's disability. However, because the ALJ appears to adopt Dr. Kapthalia's opinion, at least in part, by noting that Dr. Kapthalia indicated that plaintiff is capable of simple work, it is particularly unclear what weight was afforded Dr. Kapthalia's opinion. *See e.g.*, *Risitano v. Comm'r of Soc. Sec.*, 2007 U.S. Dist. LEXIS 58276, at * 10 (E.D.N.Y. Aug. 9, 2007) (remanding case and directing th ALJ to "identify the evidence [the ALJ] did decide to rely on and thoroughly explain . . . the reasons for his decision" if the ALJ did not intend to rely on the opinions of plaintiff's treating physicians).

The Second Circuit has stated

> We do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). The ALJ's conclusion that plaintiff is limited to one- and two- step tasks, coupled with the ALJ's failure to identify plaintiff's specific mental limitations, makes it impossible for the Court to surmise what weight, if any, was given each of the treating physicians.

The Court is also concerned with the ALJ's partial use of Dr. Kathpalia's notes, as mentioned above, without specifically addressing the remainder of Dr. Kathpalia's evaluation. In particular, the ALJ commented on Dr. Kathpalia's opinion, stating, "[m]oreover in April 2005, Dr. K. Kathpallar [sic] essentially indicates the claimant is capable of simple work." (Record at 16.) Indeed, Dr. Kathpalia checked a box on the "Medical Assessment of Ability to Do Work

Related Activities" form which indicated plaintiff's ability to "understand, remember and carry out simple job instructions" was limited but satisfactory (the definition of "Good"). (*Id*. at 135, 137.) However, the ALJ failed to address Dr. Kathpalia's other assessments of plaintiff's functional limitations, which indicate that plaintiff's ability to follow work rules, interact with a supervisor, function independently, behave in an emotionally stable manner and demonstrate reliability are seriously limited (the definition of "Fair"), and that he has no useful ability to deal with work stresses (the definition of "Poor or none"). (*Id*. at 135, 137.) Dr. Kathpalia also noted that plaintiff has difficulties with tardiness and prefers to work nights because of the reduced environmental and social demands. (*Id*. at 138.) To the extent the ALJ did reject certain of Dr. Kathpalia's opinions, the ALJ failed to give "good reasons" for this rejection by considering the factors set forth in the regulations. *See Baybrook v. Chater*, 940 F. Supp. 668, 674 (D. Vt. 1996) (remanding because the ALJ failed to apply the C.F.R. § 404.1527(d)(2) factors properly); *see also Clark*, 143 F.3d at 118.

Thus, based on the foregoing, the Court remands the action for further proceedings consistent with this opinion. A remand is appropriate in this case because the record does not contain persuasive evidence of disability requiring reversal and award of benefits. However, the ALJ's decision is deficient in several respects, as he failed to properly apply the legal standards applicable to the treating physicians' opinions and to adequately assess claimant's residual functioning capacity.[4] *See Torregrosa v.*

---

[4] Plaintiff also contends that the ALJ failed to properly assess plaintiff's credibility. In determining that, based on plaintiff's residual functional capacity, plaintiff was capable of his past work, the ALJ declined to find plaintiff's allegations regarding his limitations totally credible. Specifically, the ALJ stated that "[t]he claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of discrepancies between the claimant's assertions and information contained in the documentary reports." (Record at 15.) The ALJ pointed to plaintiff's testimony that, at his last job, he was harassed by management and had trouble with his co-workers, which the ALJ indicates was contradicted by his March 2002 psychological evaluation where he reported he "thoroughly enjoyed his job." (*Id*.) The ALJ also noted plaintiff's ability to live alone, travel by public transportation, cook and manage his own finances. (*Id*.) In addition, the ALJ stated that despite plaintiff's testimony that he has limited social skills, no friends and a hard time relating to supervisors and co-workers, plaintiff was cooperative during most of his examinations and has worked after his alleged onset date. (*Id*. at 16.) "[W]here a claimant's subjective testimony is rejected, the ALJ must do so explicitly and specifically." *Kleiman v. Barnhart*, No. 03-CV-6035 (GWG), 2005 U.S. Dist. LEXIS 5826, at * 32 (S.D.N.Y. Apr. 8, 2005) (citing *Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988) (where an ALJ rejects witness testimony as not credible, it must set forth the basis for this finding "with sufficient specificity to permit intelligible plenary review of the record")). The Commissioner is in a better position than this Court to evaluate a claimant's credibility and the ALJ explicitly and specifically articulated the reasons for rejecting plaintiff's testimony. *Youney v. Barnhart*, 280 F. Supp. 2d 52, 61 (W.D.N.Y. 2003) (citing *Crowley v. Barnhart*, 220 F. Supp. 2d 176, 181 (W.D.N.Y. 2002) (citation omitted)). Accordingly, the Court rejects plaintiff's claim that remand is warranted due to the ALJ's failure to properly assess plaintiff's credibility. However, to the extent that the ALJ, on remand, reevaluates the medical evidence in addressing the "treating physician" rule, the ALJ should also consider whether that re-

*Barnhart*, No. CV-03-5275, 2004 U.S. Dist. LEXIS 16988 (FB), at \*18 (E.D.N.Y. Aug. 27, 2004) (remanding because "(1) there is a reasonable basis to doubt whether the ALJ applied the correct legal standards in weighing the opinions of [the treating physicians], and (2) the ALJ failed to give good reasons for the weight, or lack thereof, given to those opinions"). Accordingly, upon remand, the ALJ must clarify what weight he afforded the various physician's opinions and set forth reasons, if any, for declining to afford controlling weight to plaintiff's treating physicians.

### III. CONCLUSION

For the foregoing reasons defendant's motion is DENIED and plaintiff's motion is GRANTED to the extent it seeks a remand for further proceedings. Accordingly, this case is REMANDED for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 14, 2007
Central Islip, New York

\* \* \*

The attorney for plaintiff is John Antonowicz, Esq., Fusco, Brandenstein & Rada, P.C., 180 Froehlich Farm Bloulevard, Woodbury, New York 11797. The attorney for defendant is Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, by James H. Knapp, Assistant United States Attorney, 610 Federal Plaza, Central Islip, New York 11722.

---

evaluation alters his assessment of plaintiff's credibility in light of the evidence as a whole.